UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

JOHN F. CURRAN III,                                                                  PLAINTIFF

v.                                                                       No. 5:23-cv-158-BJB

ZACHARY MILLER ET AL.                                                          DEFENDANTS

\* \* \* \* \*

## OPINION & ORDER DISMISSING CASE

According to his complaint, *pro se* Plaintiff John Curran sometimes uses his SUVs to tow boats that play a role in his one-man salvage business. In this would-be admiralty suit, he complains that the Defendants—Only MotorSports, LLC, an autobody shop located in Mt. Juliet, Tennessee, and Zachary Miller, an employee at Only MotorSports—failed to make promised modifications to his SUVs. His theory is that because they falsely misrepresented their ability to do the work—and then didn't do it—the Defendants are liable for fraud, loss of use, and conversion.

Even accepting all this as true, however, it doesn't sound in admiralty. Curran's case is about car repairs, not maritime commerce, regardless of whether he sometimes uses those vehicles in his underwater salvage business. Because the underlying dispute does not meet the requirements for admiralty jurisdiction as explained by the Supreme Court, and because Curran cannot point to any other font of subject-matter jurisdiction, the Court must dismiss his case. *See* FED. R. CIV. P. 12(h)(3).

### I. BACKGROUND

#### A. Factual Allegations

Curran ran an underwater salvage business in which he used a Toyota 4Runner to haul boats and equipment. Complaint (DN 1) at 1. He kept the truck in Calvert City, Kentucky, near the Tennessee River where he staged his boats. *Id.*

In the fall of 2021, Curran delivered the 4Runner to Only MotorSports, a local autobody shop, for "repairs and modifications" to aid his salvaging business. ¶¶ 1–2. Only MotorSports and its employee, Zachary Miller, allegedly delayed performing these modifications, forcing Curran to buy another SUV (a Lexus GX470) to continue his work in the spring of 2022. ¶ 9. Despite his alleged troubles with these Defendants, Curran asked them to modify the Lexus too. ¶ 10. In the end, the Defendants modified neither vehicle to Curran's satisfaction. So he brought these fraud, loss-of-use, and conversion claims against them under Kentucky and Tennessee law. *Id.* at 2, 4–5.

1

### B. This Litigation

Curran filed his Complaint on December 7, 2023.[1] Several months passed without Curran returning executed summonses. The following October, Curran asserted in a motion that he had lost the original affidavits of service and asked the Court for additional time to obtain replacement summonses and refile affidavits of service (DN 5). Curran then filed proof of service in November (DN 7, DN 8). In the accompanying affidavits, the process server said that he had served the Defendants about nine months earlier, in February 2024. *Id.*

Come January 2025, the Defendants had still not filed a response to Curran's lawsuit. So on January 30, 2025, the Court ordered them to file a response no later than February 20. DN 10. But they blew that deadline and moved for leave to file a response (DN 19) on March 21, 2025, asserting that their first notice of this lawsuit came in early February, in the form of a mailed copy of the January 30 order. Motion for Leave to File a Response at 2. In their motion, Defendants apologized for their delay and explained that they missed the deadline thanks to lack of knowledge about the case, difficulty in obtaining local counsel, and other obligations on the part of their Tennessee attorney. *Id.* at 1. Defendants then moved to dismiss on April 11, 2025 (DN 24), and sought leave to file an amended motion (DN 30) on May 9, 2025. The second motion departed from the first only by adding a footnote "explaining that … the previous version of [Kentucky's long-arm] statute applies to Curran's Complaint." Motion for Leave to File Amended MTD at 1. Curran responded on June 16, 2025 (DN 34).

Two additional motions remain pending before the Court.

First is Curran's "Motion to Set Aside Order Denying Default Judgment" (DN 20). Before the Defendants had filed their response, Curran moved for a default judgment on February 12, 2025 (DN 11). The Court denied that motion in a March 10 order (DN 11), noting that Curran had failed to first ask that the Clerk enter the Defendants' default, as required by the Federal Rules. Curran then filed a "Motion to Set Aside Order Denying Default Judgment" (DN 20), asserting that he had, in fact,

---

[1] This is far from Curran's first foray into a federal forum. Four years ago, a federal judge in Tennessee noted that Curran "has proven unreliable in asserting matters of material fact" and, in legal matters, "has demonstrated a pattern of serious deception and very poor argumentation." *Curran v. Wepfer Marine, Inc.*, 2021 WL 5998009, at *1 (W.D. Tenn. Dec. 20, 2021) (reviewing Curran's history of misrepresentation and frivolous litigation). The court also imposed Rule 11 sanctions, ordering that Curran "may not file a claim in the Federal District Courts of the Western District of Tennessee against any of the Defendants named in this case without leave of the Court." *Id.* at *2.

2

included a request for entry of default and asking the Court to reconsider its March 10 order.

Second, Curran moved to compel discovery on August 14, 2025 (DN 42). Defendants filed their response on August 27, 2025 (DN 43).

* * *

Neither these nor the motions to dismiss, however, affect the Court's analysis of whether it possesses subject-matter jurisdiction over this suit. The Court has an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). And Curran's claims fall far outside the Court's admiralty jurisdiction. So the Court dismisses this case and denies as moot all pending motions.

## II. THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER THIS DISPUTE.

Curran sues both Defendants for fraud, loss of use, and conversion. Curran argues that because he uses the two SUVs in pursuit of a maritime trade (underwater salvage work), the Court possesses admiralty jurisdiction over these tort claims. Complaint at 1.[2]

### A. The Court lacks admiralty jurisdiction.

The Constitution "extend[s]" the "judicial Power … to all Cases of admiralty and maritime Jurisdiction," Art. III, § 2, and Congress has given "original jurisdiction" over such suits to the federal district courts, 28 U.S.C. § 1333.

Traditionally, tort claims like Curran's fell within this jurisdictional grant only if the alleged torts *exclusively* "occurred on navigable waters." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531 (1995).[3] That made admiralty a narrow font of jurisdiction: if any part of the "wrong and injury" happened on land, another source of federal jurisdiction was necessary. *See, e.g.*, *The Plymouth*, 3 Wall. 20, 34–35 (1866) ("[T]he wrong and injury complained of must have been committed wholly upon the high seas or navigable waters, or, at least, the substance

---

[2] Curran also asserts, in passing, that the Court has jurisdiction under 28 U.S.C. § 1332, based on the diversity of the parties' citizenship. From his complaint, however, he (like the Defendants) appears to reside in Tennessee. Without any allegations to the contrary, the Court sees no basis for diversity jurisdiction here. *See Hertz Corp. v. Friend*, 559 U.S. 77, 96 (2010) (burden is on party seeking to invoke diversity jurisdiction).

[3] A different principle applies to contract claims asserted in admiralty jurisdiction. *See Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 23–24 (2004). But all of Curran's claims sound in tort. *See* Complaint ¶ 17 ("No contract for the work was entered into nor executed.").

and consummation of the same must have taken place upon these waters to be within the admiralty jurisdiction.").[4]

In 1948, however, Congress expanded the federal courts' admiralty jurisdiction to reach injuries "caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." Extension of Admiralty Jurisdiction Act, Pub. L. No. 80-695, 62 Stat. 496 (codified as amended at 46 U.S.C. § 30101) (formerly codified at 46 U.S.C. app. § 740).[5] As signaled by the law's name, this extended the possibility of admiralty jurisdiction from incidents entirely on water to those merely partially on water. *See generally* Robertson & Sturley, *The Admiralty Extension Act Solution*, 34 J. MAR. L. & COM. 209, 245–49 (2003). Although torts still must touch navigable waters to trigger admiralty jurisdiction, they needn't happen *completely* on navigable waters. *Grubart*, 513 U.S. at 534; *see also* Robertson & Sturley at 245 ("Congress intended to correct perceived inequities that regularly arose when a vessel on navigable water damaged a land-based structure, such as a bridge or pier.").

But how would courts delimit Congress' new "caused on water, felt on land" expansion? In most cases, the old water-only rule continues to track the scope of the federal admiralty jurisdiction. Despite "borderline cases" that may invite "elaborate casuistry, … the main business of the (admiralty) court involves claims for cargo damage, collision, seamen's injuries and the like—all well and comfortably within the circle, and far from the penumbra." *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 254 (1972) (quoting GILMORE & BLACK, THE LAW OF ADMIRALTY 24 n.88 (1957)).

To give effect to Congress' expansion without sweeping in every dispute with an incidental relation to water, the Court crafted a new "connection" criterion that pairs with the traditional "location" criterion. To determine whether admiralty jurisdiction exists over disputes involving water- *and* land-based conduct, courts first ask whether the dispute arose, at least in part, on a navigable waterway (the relaxed "location test"), and then pose two more questions (the "connection test"). Does the case involve "activity" that poses a "potential hazard to maritime commerce?" *Sisson v. Ruby*, 497 U.S. 358, 362 (1990) (quoting *Foremost Insurance Co. v. Richardson*, 457

---

[4] *See also The Moses Taylor*, 4 Wall. 411, 416 (1866); *Philadelphia, Wilmington & Baltimore Railroad Co. v. Philadelphia & Havre de Grace Steam Towboat Co.*, 23 How. 209, 215 (1859); *Thomas v. Lane*, 23 F. Cas. 957, 960 (C.C. Me. 1813) (Story, J., riding circuit).

[5] Today, the statute reads, in pertinent part: "The admiralty and maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land." 46 U.S.C. § 30101(a).

4

U.S. 668, 675 n.5 (1982)).  And if so, does "a substantial relationship" connect "the activity giv[ing] rise to the incident" with "traditional maritime activity?"  *Id.* at 364. Only after clearing "both" barriers—the tightly anchored "location" test and the more free-floating "connection" test—will a tort case land within the admiralty jurisdiction of the federal courts.  *Grubart*, 513 U.S. at 534 ("[A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity."); *see also Buccina v. Grimsby*, 889 F.3d 256, 259 (6th Cir. 2018) ("An incident falls within our admiralty jurisdiction if it (1) occurs on a navigable waterway, (2) could potentially disrupt maritime commerce, and (3) bears a substantial relationship to traditional maritime activity.") (quotation marks omitted).

As to location, Curran's case plainly fails because the alleged injury didn't "occu[r] on navigable water" and wasn't "caused by a vessel on navigable waters." *Grubart*, 513 U.S. at 534 (citing 46 U.S.C. § 30101).  The controversy between Curran and the Defendants, at least as described in the complaint, occurred in Mt. Juliet, Tennessee, in the autobody shop operated by Only MotorSports—which is miles from any navigable water.  Complaint ¶¶ 2, 6, 14.  Nothing in Curran's complaint indicates that Miller or Only MotorSports fraudulently misrepresented their services, or converted his vehicles, while on a navigable water.  Even under the expanded version of admiralty's location inquiry, at least *some* of the tort needs to happen on water. *See* 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 3:5 (6th ed. 2018). Yet Curran doesn't allege that a "vessel on navigable water" caused his injury, *Grubart*, 513 U.S. at 534, or that his case involves a vessel at all.  Although the alleged torts might have downstream effects on Curran's water-based activities, no "navigable waters" (or even maritime activity) lie upstream.  So Curran's claims fail to satisfy this most basic locational requirement, even under Congress's expanded admiralty jurisdiction.

As to "connection," Curran's claims likewise fail to show "activity" that "has a potentially disruptive impact on maritime commerce" and bears "a substantial relationship to traditional maritime activity."  *Id.* at 534.  This is true despite the trickiness of the preliminary question regarding how to define the "activity" that matters here.  The Supreme Court, channeling Goldilocks more than Grotius, has instructed inferior courts to answer this question at neither a high nor a low but instead an "intermediate level of possible generality."  *Id.* at 538; *see also* Robertson & Sturley at 222.  "The jurisdictional inquiry does not turn on the *actual* effects on maritime commerce of the [tort alleged]; nor does it turn on the particular facts of the incident in this case."  *Sisson*, 497 U.S. at 363.  "Rather, a court must assess the general features of the type of incident involved."  *Id.*; *accord Grubart*, 513 U.S. at 534.

A handful of subsequent decisions provide some clarification of this "*Foremost-Sisson*" standard for maritime activity. *See Grubart*, 513 U.S. at 552 (Thomas, J., concurring in judgment). In one case, the relevant activity was "a fire on a vessel docked at a marina on navigable waters." *Sisson*, 497 U.S. at 363 (holding admiralty jurisdiction satisfied). In another, "the relevant activity was not a plane sinking in Lake Erie, but air travel generally." *Id.* at 364 (citing *Executive Jet*, 409 U.S. at 269–70) (rejecting admiralty jurisdiction). In a third, it was "repair or maintenance work on a navigable waterway performed from a vessel." *Grubart*, 513 U.S. at 540 (admiralty jurisdiction satisfied).

Although this sort of case-by-case analogical analysis is "inevitabl[y] imprecis[e]," *id.* at 542, Curran's case isn't a close one. The torts alleged here (fraudulent misrepresentation, loss of use, and conversion) affect maritime commerce only in the most tenuous sense: by possibly hampering Curran's salvaging work, which at least sometimes occurs on navigable waterways. However the Court characterizes the relevant activity—car repair, repair of a car sometimes used to tow boats, or even repair of a car used in salvage operations—it fails both prongs of the connection test. It makes little difference, after all, that Curran might be able to show *his* quasi-maritime business suffered from the loss of the SUVs, because the connections test deals in generalizations rather than particulars. The first question is whether the tortious failure to repair boat-towing cars threatens maritime commerce—and it obviously doesn't. And the second question is even easier than the first: such torts have no "relationship to traditional maritime activity"—much less a "substantial" one. *Grubart*, 513 U.S. at 534.

Caselaw applying the *Foremost-Sisson* test confirms this conclusion. Other courts have dismissed tort claims for lack of admiralty jurisdiction with a much stronger claim to affect maritime commerce. *See, e.g.*, *In re Nolty,* 841 F. Supp. 209, 210–12 (S.D. Tex. 1994) (no admiralty jurisdiction over car crash in the course of maritime employment); *Kuehne & Nagel (AG & Co) v. Geosource, Inc.*, 874 F.2d 283, 289 (5th Cir. 1989) (no admiralty jurisdiction over fraudulent inducement, on land, to sign affreightment contract); *J. Lauritzen A/S v. Dashwood Shipping Ltd.*, 65 F.3d 139, 142 (9th Cir. 1995) (similar); *Middleton v. M/V GLORY SKY I*, 567 F. App'x 811, 814–15 (11th Cir. 2014) (no admiralty jurisdiction over conversion of black beans stored on land and moved to a vessel); *In re Carter*, 743 F. Supp. 2d 103, 107 (D. Conn. 2010) (no admiralty jurisdiction based on fire that broke out on a dry-docked boat and destroyed other boats).

Curran's case for admiralty jurisdiction thus fails twice over. All the pertinent events took place on land, flunking the location test. And any alleged downstream effects on his salvage operation, and through it maritime commerce, are legally insufficient and factually speculative—flunking the connection test. This dispute

about car repairs has no real connection with admiralty—much less a "genuinely salty flavor." *Kossick v. United Fruit Co.*, 365 U.S. 731, 742 (1961).

### B. Curran's counterarguments are unavailing.

In response, Curran makes four arguments, none of which show admiralty jurisdiction exists over this suit.

*First*, Curran repeats his argument that his SUVs are "affiliated maritime assets" and therefore give rise to admiralty jurisdiction. MTD Response at 7–8. He cites *Liberty Mutual Insurance Co. v. Fruehauf Corp.*, 472 F.2d 69 (6th Cir. 1972), for the proposition that equipment used to support traditional maritime activity can give rise to admiralty jurisdiction. He then cites *The Blackwall*, 10 Wall. 1 (1869), arguing that salvage is a traditional maritime activity. But although the latter premise is surely true, *Liberty Mutual* lends Curran no aid on the former. That decision did not deal with the question of admiralty jurisdiction, as the court was sitting in diversity while adjudicating "a non-maritime tort." 472 F.2d at 69. And it certainly did not hold that "affiliated maritime assets"—a term Curran repeatedly employs but which appears nowhere in the opinion, nor (apparently) in admiralty jurisprudence in any respect—give rise to admiralty jurisdiction. *Id.* at 71.

*Second*, Curran claims that admiralty jurisdiction exists here because the court has *in rem* jurisdiction over the vehicles under Supplemental Admiralty Rules C(1)(a) and E. MTD Response at 10. The Supplemental Rules themselves do not provide an alternative path to admiralty jurisdiction, however. *Cf. Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 370 (1978) ("[I]t is axiomatic that the Federal Rules of Civil Procedure do not create or withdraw federal jurisdiction."). The Rules instead presuppose that a valid action in admiralty or an analogous action is before the Court. *See* FED. R. CIV. P. Supplemental Rule A(1).

Supplemental Rule C(1)(a), for example, reads: "**When Available.** An action in rem may be brought … [t]o enforce any maritime lien." This text presupposes the existence of a valid maritime lien. *See* 2 SCHOENBAUM § 21:4 ("An *in rem* action may be brought only by a plaintiff who possesses a maritime lien or who has a statutory in rem right."). Nor can a maritime lien exist against an SUV: "Maritime liens may only attach to maritime property such as vessels (including their appurtenances and equipment), cargo, freights, and subfreights." 1 SCHOENBAUM § 9:1. Likewise, Supplemental Rule E applies to "actions in personam with process of maritime attachment and garnishment, actions in rem, and petitory, possessory, and partition actions." But this case involves neither maritime attachment nor a possessory dispute over a vessel. So Curran gives the Court no reason to think either Rule renders this an *in rem* admiralty suit.

And it obviously isn't. For one, Curran hasn't styled it as one. And in this case, the lawsuit's substance matches its form. A suit *in rem* is a suit against a thing—not a person. *See, e.g., Hanson v. Denckla*, 357 U.S. 235, 246 & n.12 (1958) ("A judgment in personam imposes a personal liability or obligation on one person in favor of another. A judgment in rem affects the interests of all persons in designated property."). So a suit *in rem* must identify some property—in admiralty cases, almost always a boat—whose ownership is in dispute. *See, e.g., United States v. Peters*, 5 Cranch 115, 139–41 (1809); *United States v. Bright*, 24 F. Cas. 1232, 1236 (C.C. Pa. 1809) (Washington, J., riding circuit). This one doesn't. And even if it did, such a suit would adjudicate only who owns the boat—not tort claims like Curran's, which seek to recover money from distinct natural and corporate persons.

*Third*, Curran alleges that Defendants are liable because they have not complied with Kentucky or Tennessee law regarding "garage keepers." MTD Response at 9–10 (citing KY. REV. STAT. § 376.270) (setting rules for those businesses "selling, repairing or furnishing accessories or supplies for motor vehicles"). But he never explains why state law concerning (presumably land-based) garage keepers would add a federal maritime dimension to this lawsuit. Nor, for that matter, does he explain why Kentucky law would bind a Tennessee-based garage keeper.

*Last*, Curran asserts that discovery will vindicate his claims. *Id*. at 10, 12. This is beside the point. Even if the Court did possess jurisdiction over this claim, "the mere prospect of uncovering sufficient facts in discovery … does not excuse [a plaintiff] from the need to plead facts upon which relief could be granted in their complaint." *Budget Charters, Inc. v. Pitts*, No. 3:17-cv-722, 2018 WL 1745780, at *9 (M.D. Tenn. Apr. 11, 2018).

## ORDER

Because subject-matter jurisdiction is lacking, the Court dismisses this suit and denies all pending motions as moot.

Benjamin Beaton, District Judge
United States District Court

March 2, 2026